UNITED STATES DEPARTMENT OF COMMERCE
BEFORE THE UNDER SECRETARY FOR TECHNOLOGY

| | |
|---|---|
| Christopher S. Van Winkle and David A. Cox, | ) |
| Appellants, | ) |
| v. | ) |
| Department of the Army, | ) |
| Appellee. | ) |

## DECISION ON APPEAL FROM GOVERNMENT EMPLOYEE RIGHTS DETERMINATION

This is an appeal by Christopher Sean Van Winkle and David Alan Cox under 37 CFR 501.8 from a determination by the Department of the Army (Army) that the Government shall have a royalty-free license in their invention. The invention is described in U.S. Patent 7,076,806, which issued July 18, 2006 on an application filed by the inventors on December 30, 2004, and which contains an acknowledgment that the Government may have a paid-up license. The first Army employee rights determination found that the inventors were entitled to retain ownership of the invention subject to a Government license. That determination was vacated and remanded to Army by the Acting Under Secretary for Technology on February 13, 2006, with instructions to consider all relevant information submitted after the initial rights determination was made by Army.

Subsequently, on April 3, 2006, Army again determined that the Government was entitled to a royalty-free license in the invention, and the inventors again appealed on May 4, 2006. A hearing was held before the Under Secretary for Technology on November 15, 2006.[1]

The determination is Vacated and Remanded.

### Background

A. Facts

In 2003, Christopher Sean Van Winkle and David Alan Cox ("the inventors") observed, while serving as Physician Assistants

[1] Army was represented by Alan P. Klein and the inventors by Jack B. Hicks. An earlier hearing was held on August 17, 2005.

EXHIBIT
tabbies
A

in the 82nd Army Airborne Division stationed near Fallujah, Iraq, that many of the soldiers they treated experienced serious wounds in the upper torso even though they were wearing body armor. They observed that these wounds were due to shrapnel from Improvised Explosive Devices(IEDs)hitting the soldiers in unprotected areas in the flank, shoulder and deltoid. Working approximately 50 hours while off duty in their barracks, the inventors designed modifications (flaps and panels)[2] to an existing interceptor body armor (or bullet proof) vest. The modifications were intended to provide improved coverage for areas around the soldier's arms, which were left exposed by the existing body armor. The modifications were designed to fit in a way that would not unduly restrain the range of motion of the soldier's arms and torsos while in combat.

One embodiment of the invention was a panel inserted inside the vest under one or both of the armpits and suspended by retainer loops sewn in the vest. This was called an axillary panel. Another embodiment was a fold-over epaulet of flexible but strong material to be attached under the collar assembly by hook-and-loop fasteners (Velcro strips) on one or both shoulders and secured around either or both arms by similar strips. The latter strips are expandable so as to fit any size of arm. This was called a deltoid panel or flap. When both embodiments were a part of a body armor vest, the invention was called a deltoid axillary protective device or DAP.

On September 20, 2003, the inventors made a cardboard model of the DAP and disclosed the concept to Lt. Col. George K. Bal, MD, an orthopedic surgeon, Captain McDonald, and Major Courtines. Van Winkle also made a drawing of the DAP in September 2003 and showed it to Lt. Col. Bal and Major Courtines.[3] Bal and Van Winkle prepared a memorandum dated October 27, 2003 describing the DAP.[4] The record also contains a copy of another drawing[5]

---

[2] *See* inventors' affidavits of November 22, 2004. According to the inventors many attempts were made to design the modifications.

[3] A copy of this undated drawing was attached to Van Winkle's supplemental affidavit of January 21, 2005.

[4] A copy of the draft memorandum was attached to the inventors' reply of September 21, 2005. This memorandum included an idea to use the groin flap as the axillary panel.

[5] A copy of this undated drawing was attached to Van Winkle's supplemental affidavit of January 21, 2005 and described as representative of the cardboard model of the deltoid portion of the DAP.

and a photograph[6] of the cardboard model of the deltoid panel.

Several months later, the Command instructed the inventors to go to the 82nd Airborne rigger shop at FOB Ridgeway and work with two parachute riggers to produce a prototype DAP. The prototype was finished in several hours using a small amount of scrap ballistic nylon and 12 inches of Velcro tape. The pattern was drawn by Van Winkle on the nylon and given to the riggers to be cut and sewn per the inventors' instructions.[7]

The riggers subsequently made 40 DAPs and gave them to the 1st Battalion 505th Parachute Infantry Regiment to test the ergonomics of the device.[8] In the first field test sometime in late December 2003 or early January 2004, a soldier wearing a DAP was struck by shrapnel from an IED but walked away without a scratch.[9] A piece of shrapnel penetrated the initial layer of the body armor but was stopped by the DAP. The DAPs were so popular that soldiers refused to return the prototypes.[10] The 82nd Airborne Division approved the prototype and quickly sought to have it mass produced. In June 2004, a 3-year contract for $239.4 million was awarded to Point Blank Body Armor Inc., to produce vests modified with the DAP. The final design of the modified vest was approved in just 10 hours.[11]

B. The Invention

As noted above, the DAP invention relates to coverage with ballistic material of the flank, shoulder and deltoid areas of a soldier wearing a body armor vest. One embodiment of the invention consists of a panel fitted inside the armor and suspended by loops sewn inside the armor. The straps are adjustable to accommodate any size of arm. Another embodiment is a deltoid flap attached under the collar assembly and around

---

[6] The photograph was attached to the inventors' reply of September 21. 2005.

[7] *See* the inventors' reply of September 21, 2005 and their affidavits of November 22, 2004.

[8] *See* the February 7, 2004 issue of The Canopy, entitled "GI Innovation Saves Lives," attached to the inventors' first notice of appeal dated November 22, 2004.

[9] *Id.*

[10] *See* the inventors' affidavits of November 22, 2004.

[11] *See* August 2004 article by Barbara Perkins on Point Blank Body Armor, submitted with inventors' notice of appeal, http://www.findarticles.com/p/articles/mi_m0OQD/is_8_7/ai_n6181024/print, accessed November 11, 2004.

either or both arms, secured in place with Velcro strips.

C. The Invention Rights Questionnaires

A substitute Invention Rights Questionnaire, DA Form 2871 dated March 10, 2006,[12] reveals the following:

(1) The inventors spent fifty hours of their own time and no Government time in making the invention.

(2) A written description of the invention was made on September 20, 2003.

(3) A model was made on September 20, 2003 because "it was desired to test the operability or practicality of the invention."

(4) No Government contributions of facilities, equipment, materials or information were identified.

(5) Neither inventor was employed or assigned to:

(a) invent, improve or perfect any process;
(b) conduct or perform research or development;
(c) supervise, coordinate or review research and development; or
(d) act in a liaison capacity for research and development.

(6) Major Michel-Alexis Courtines, MD, Brigade Surgeon, 3rd Brigade, 82nd Airborne Division, and the inventors' supervisor at the time of the invention, concurred with their statements in the rights questionnaire. Major Courtines indicated that the invention was unrelated to the inventors' duties, which, as Physician Assistants (65D5P), were to treat all sick, wounded or injured U.S. and Coalition soldiers as well as any captured enemy or wounded civilians in Iraq. He also stated that the inventors could continue development work on the invention as a Government project without any approval.

The rights questionnaire submitted to Army on August 12, 2004 differed from the 2006 questionnaire only by identifying in section 11 various Government contributions to the invention, including the use of two Army parachute riggers, an Army sewing machine in an Army facility, Army scrap ballistic nylon and Velcro tape worth up to $10 to make a prototype in 4 hours. This is contrasted with the negative in question (4), above. The

[12] According to the inventors' appeal of May 4, 2006, they submitted the first rights questionnaire on January 31, 2004, which was lost by Army. They then resubmitted the first questionnaire on August 12, 2004.

questionnaire was signed on August 6, 2004 by Major Courtines, who concurred with the statements by the inventors.

D. Army's Rationale Justifying Taking of a License

In its determination dated April 3, 2006, Army found that because the invention was made with its contribution of facilities, equipment, material and time of other Government employees during normal working hours, it could require title to be assigned to the Government, or alternatively could require the inventors to grant a royalty-free license to the Government. Thus, Army found that even though there was no presumption of an assignment to the Government arising from the inventors' duties as Physician Assistants, the Government could still require title to be assigned to it because of Army's contribution to the invention. However, because Army[13] indicated that it did not have sufficient interest to file a patent application, the inventors were permitted to retain ownership to their invention, subject to a royalty-free license to the Government, as provided for in the Executive Order.

Based upon the evidence,[14] Army concluded that the inventors "constructed a cardboard template on 20 September 2003, and nothing more, and did not construct a prototype of their invention until December of 2003, when they constructed a prototype of ballistic nylon with the help of the Army riggers."[15] Army disagreed that the invention was made in September 2003 but found rather that it was made after December 2003, when the inventors used Army riggers to help them cut and sew together a prototype from ballistic nylon, which was subsequently tested successfully on a soldier in the field.[16]

In response to a request made on behalf of the Under Secretary for Technology by the Patent Counsel for the Department of Commerce on August 8, 2006, Army submitted an affidavit on September 7, 2006 by Matthew S. Burkins, an armor expert. Mr. Burkins testified that the cardboard model did "not demonstrate that the device would work for its intended purpose without

---

[13] The Army Research Laboratory.

[14] Army's determination of April 3, 2006 considered both invention rights questionnaires, affidavits by the inventors dated November 22, 2004, their supplemental affidavits dated January 21, 2005 and an affidavit by Robert A. Coffelt, an expert on armor, submitted on behalf of the inventors. Army also considered three photographs and two drawings of the DAP and a copy of the patent application on the DAP, as filed.

[15] Invention Rights Appeal Report, May 12, 2006, page 3.

[16] *Id.*

further testing" because "[t]he state-of-the art in body armor technology is not advanced to the point that final ballistic performance can be predicted prior to testing." On September 28, 2006, the inventors submitted a rebuttal affidavit by their expert Coffelt, who explained that although it is understandable that the Army might want to conduct its own testing prior to purchasing the body armor, the particular invention was not a new specification but "simply to provide coverage to a currently unprotected area with some kind of ballistic material."[17]

<u>Issue on Appeal</u>

Because the Army concedes that the inventors' duties were not such as to presume an assignment of title in the invention to the government, the issue to be decided on appeal is whether or not the Army has any rights in the invention arising from a Government contribution to the invention. If a Government contribution was made, based upon the Army's earlier finding that the inventors did not have R&D duties, the presumption is that title remains with the inventors, but that the Government is entitled to, at least, a license in the invention.[18]

However, if no Government contribution was made, title and all rights to the invention properly would remain with the inventors. Thus, since there is no dispute that the invention was conceived without any Government contribution, the specific question is whether or not the government made a contribution to the first actual reduction to practice[19] of the invention.[20] The inventors maintain that since the cardboard model DAP was the first actual reduction to practice, there was no government contribution to the invention. Army argues that the cardboard model was not a reduction to practice and that the reduction to practice did not occur until a later date, with the contribution

[17] See <u>Declaration of Robert Coffelt,</u> September 28, 2006, paragraph 7. Van Winkle and Cox submitted an earlier affidavit from Robert Coffelt dated January 5, 2005 declaring that in his opinion, based upon the cardboard model of September 2003, "someone skilled in the art of body armor would understand that the DAP would work for its intended purpose without any further testing." (<u>Affidavit of Robert Coffelt</u>, January 6, 2005, paragraph 6).

[18] *See* 37 CFR 501.6(3)

[19] *See* 37 CFR Part 501.6. *Also see infra* discussion pp. 8-9.

[20] "Made", as used in Executive Order 10096 is not defined. It was first defined by the Patent and Trademark Office in 1987 to be the "conception or first actual reduction to practice" of an invention. <u>In re King</u>, 3 USPQ2d at 1751. The definition was later codified in 37 CFR 501.3(e) in 1996.

of government resources.

## Analysis

The inventors contend that Army made no contribution to the making of the invention because the invention was made - both conceived and first actually reduced to practice - before any Army resources were used.[21] There is no dispute that the invention was conceived without any Government contribution. The inventors maintain that the cardboard model of the DAP, which they made on their own time in September 2003, was both the conception and first actual reduction to practice of the invention. The inventors point out that during the course of performing their duties as medics they discovered from the nature of the wounds they treated that the body armor worn by the soldiers was deficient. Then, they designed the DAP during their free time.[22] In support of their position, the inventors submitted an affidavit by Coffelt,[23] who declared under oath on January 26, 2005 that at the time the cardboard model of the DAP

[21] This is not the first rights appeal when an employee has asserted that the invention was made before the use of any Government contribution. In King, the Government was found to be entitled to a license because the Air Force tested a pallet coupler prototype made by an Air Force forklift operator. In Farley v. NASA, 37 USPQ2d 1347 (Dept. of Commerce 1993), the Government was held to be the owner because the inventor, a materials engineer, made a wooden model of the invention at work with another employee. In Flanagan v. Department of Army, 65 USPQ2d 1478 (Dept. of Commerce 2002), the Government was found to own an invention by an environmental science officer because he reduced to practice a computer information system for soldiers to avoid heat induced casualties using Government supplies and funds at work. In Schroeder, 3 USPQ2d 1057 (Comm. Pat. 1986), the Government was held to own a light pen invention by a research psychologist because of the Government time he used to develop a prototype target marksmanship trainer for the Army. Finally, in In re Scalese, 3 USPQ2d 1231 (Comm. Pat. 1986), the Government was found to own a probe invention to inspect for cracks in aluminum holes because the Air Force employee tested it on Government time and in Government facilities. Each of these cases, however, turned on fact-specific issues which allowed the court to find a Government contribution to the respective inventions. As such, the government was entitled to an interest in the invention. In this case, we believe that there is no such governmental contribution.

[22] *See* inventors' affidavits: Affidavit of David Cox dated 22 November 2004, and Affidavit of Christopher Van Winkle dated 22 November 2004.

[23] *Id.* at footnote 17.

was completed in September 2003, "someone skilled in the art of body armor would understand the DAP would work for its intended purpose without any further testing." Coffelt further explained that "given the nature of the DAP's design, ballistic testing was not required because the ballistic performance of the planned construction materials was already proven and widely in use."

The inventors have asserted that all the claims of the patent are supported by the cardboard model.[24] Army, in its response of August 28, 2006, pointed out that all the patent claims relate to body armor whether in the preamble (claims 1-8, 12 and 13) or the body of claim (claims 9-11). Army further asserted that since the cardboard model was neither a body armor accessory nor body armor, it could not constitute a first actual reduction to practice of the patented invention.

Although a model is generally evidence of conception and not reduction to practice,[25] the question here is whether the model is also a reduction to practice. The extent to which testing is needed to establish a reduction to practice is a matter to be decided on case-by-case basis. King, 3 USPQ2d at 1750.

To help determine whether or not the cardboard model was a reduction to practice and to help determine whether or not more testing was needed to establish a reduction to practice, it is useful to examine what the patented invention is claimed to be.[26] The independent claims of the patent, claims 1 and 9, are both directed towards axillary panels made of a "ballistic material that impedes the penetration of at least one foreign object . . ." where the coverage provides ". . . greater protection to an axillary area of the wearer than provided by the vest without the panel." Dependent claims 5 and 11 refer to a "material that impedes the penetration of at least one foreign object. . . wherein the axillary panel overage area provides greater

---

[24] *See* inventors' responses of September 21, 2005 and August 23, 2006.

[25] *See* Farley v. NASA 37 USPQ2d 1347m 1349 (Dept. of Commerce 1993. *See also* Scott et al. V. Finney, 34 F.3d 1058, 1061 (Fed. Cir. 1994)("To show reduction to practice, the junior party must demonstrate that the invention is 'suitable for its intended purpose.'")

[26] Ordinarily, rights determinations or appeals from them do not focus on patent claims because the determinations are usually made prior to filing a patent application. *See* In re Kirkland, 230 USPO 477 (Comm'r Pat. 1986). We note that in King, there was no discussion of the claims although there was a patent. We think the claims are important in this appeal because they demonstrate what the invention actually is - and that is critical to the outcome of this appeal.

protection to an axillary area of the wearer than that provided by the vest without [the panel]."

From the claims of the patent, we learn that the invention is to provide "greater protection to any axillary area of the wearer than provided by the vest without the panel." The patent is not directed towards a new or improved ballistic material, or even towards a particular type of ballistic material, but rather it is directed towards improved coverage using any ballistic material that "impedes the penetration of at least one foreign object."

## Conclusion

Improved coverage is a clear and direct result of the model. Further, based upon the Patent Specification, the invention does not have to work flawlessly, it simply must offer improved protection to the user.

Army has argued that a paper model to deflect IEDs cannot be a reduction to practice until it is made of ballistic material and is tested. However, the fact that the model was made out of a different material than the body armor "is relevant only to the extent it indicates that the inventor could not, from the purported reduction to practice, have determined that the invention would work for its intended purpose." Slip Track Systems, Inc. V. Metal-Lite, Inc., 304 F.3d 1256, 1268, 64 USPQ2s 1423, 1431 (Fed. Cir. 2002).[27] As noted above, we believe that the inventors could have determined that the invention would work for its intended purposes, that is, improved coverage, based simply upon construction of the model.

Further supporting the inventors' claim that the model was a reduction to practice, there is no evidence in the record that the design changed in any significant way after the cardboard model was constructed. Indeed, from the testimony provided, a prototype was made in only 1½ hours and the DAP went into production without further research and development by the Army. This indicates that the design of the DAP was simple and that it would work as intended, that is, to provide improved coverage.[28]

---

[27] Slip Track was an interference case where the Federal Circuit reversed the lower court and found that there was sufficient evidence of a reduction to practice in favor of Slip track's cardboard prototype to support a remand.

[28] *See* Eastern Rotocraft Corp. V United States, 384 F.2d 429, 431 (Ct. Cl. 1967) (Some Devices are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate their workability") *and* Gordon v. Hubbard et al., 347 F.2d 1001, 1006 (C.C.P.A. 1965) ("In all of the cases in which this court has reviewed whether sufficient and

The evidence showed that the inventors made a cardboard model of the DAP and disclosed it to Lt. Col. George K. Bal, MD, an orthopedic surgeon, Captain McDonald and Major Courtines on September 20, 2003. The inventors further showed the drawing of the DAP in September 2003 to Lt. Col. Bal and Major Courtines. We conclude that the evidence indicates that the first reduction of practice of the DAP was in September 2003.

We find that, in this case, the cardboard model was not only indicative of a conception but it also was a reduction to practice since one of ordinary skill in the art of body armor could have determined that the invention would work for its intended purpose, improved coverage, based solely upon the model. We agree with inventors that the claims of the patent are supported by the cardboard model and that further testing was not necessary to establish the reduction to practice. We therefore conclude that the invention was not made during work hours or with a contribution by the Government of facilities, equipment, materials, funds or information, or time or services of other Government employees on official duty, and that the invention does not bear a direct relation to and was not made in consequence of the official duties of the inventors.

---

proper testing has occurred to establish a reduction to practice, we have taken pains to point out that the nature of testing required depends on the specific facts of the case. A certain amount of 'common sense' must be applied in determining the extent of testing . . . In instances where the invention is sufficiently simple, mere construction or synthesis of the subject matter may be sufficient to show that it will operate satisfactorily.") *See also* Slip Track, supra, 304 F.3d at 1267, 64 USPQ2d at 1430 ("Testing is required to demonstrate reduction to practice in some instances because without such testing there cannot be sufficient certainty that the invention will work for its intended purpose.")

DECISION

The determination by the Army that the Government is entitled to a royalty-free license in the above-identified invention is vacated and remanded to the Army. Any request for reconsideration or modification of this decision must be filed within thirty (30) days from the date below.

Date: 3/20/07

Robert C. Cresanti
Robert Cresanti
Under Secretary for Technology

cc: Jack B. Hicks
Womble Carlyle Sandridge & Rice, PLLC

Alan P. Klein
Intellectual Property Counsel of the Army
Office of The Judge Advocate General
Department of the Army