# In the United States Court of Federal Claims

************************************************

CHRISTOPHER SEAN VAN WINKLE
and DAVID ALAN COX,

Plaintiffs,

v.

No. 07-652C
(Judge Baskir)

THE UNITED STATES OF AMERICA,

Defendant.

************************************************

## APPENDIX TO JOINT PRELIMINARY STATUS REPORT

GARY H. NUNES
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, Fourth Floor
Tysons Corner, Virginia 22182
Telephone: (703) 790-3310
Fax: (703) 790-2623

Of Counsel:
Jack B. Hicks
Womble Carlyle Sandridge & Rice, PLLC
300 North Greene St., Suite 1900
Greensboro, NC 27401
Telephone: (336) 574-8030
Fax: (336) 574-4520

Holly Emrick Svetz
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, Fourth Floor
Tysons Corner, Virginia 22182
Telephone: (703) 790-3310
Fax: (703) 790-2623

Counsel for Plaintiffs

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN J. FARGO
Director

CONRAD J. DEWITTE, JR.
Trial Attorney
Intellectual Property Staff
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
Telephone: (202) 307-0459
Fax: (202) 307-0345

Counsel for Defendant

## TABLE OF CONTENTS

U.S. Patent No. 7,076,806 (Pages 2, 5, 6) .............................................. 1

Decision by the Department of Commerce dated March 20, 2007 (Page 3) ........................................................................... 2

Decision on Request for Reconsideration of Decision on Appeal From Employee Rights Determination dated May 1, 2007 (Page 9) ........................................................................... 3

U.S. Government Contract No. W91CRB-04-D-0014 (Page 9)................ 4

Modification Number P00004 to the '0014 Contract (Page 9).................. 5

US007076806B1

(12) **United States Patent**
**Van Winkle et al.**

(10) **Patent No.: US 7,076,806 B1**
(45) **Date of Patent: Jul. 18, 2006**

(54) **BODY ARMOR**

(76) Inventors: **Christopher Sean Van Winkle**, 417 Jamestown Ave., Fayetteville, NC (US) 28303; **David Alan Cox**, 116 Proclamation Dr., Raeford, NC (US) 28378

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/027,281**

(22) Filed: **Dec. 30, 2004**

(51) **Int. Cl.**
***F41H 1/02*** (2006.01)

(52) **U.S. Cl.** ........................................................ **2/2.5**

(58) **Field of Classification Search** .................... 2/2.5, 2/102, 94, 96, 97, 464, 467; 89/36.01, 36.02, 89/36.05; 428/911

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,755,475 A * 7/1956 Lipshitz ........................ 2/2.5
3,514,786 A 6/1970 Terwilliger
4,425,667 A 1/1984 Harrison
4,485,492 A 12/1984 Sneider
4,497,069 A 2/1985 Braunhut
4,993,076 A 2/1991 Dierickx
5,044,011 A 9/1991 Henderson
5,060,314 A * 10/1991 Lewis ........................... 2/2.5
5,495,620 A * 3/1996 Schoenweiss et al. .......... 2/2.5
5,623,729 A * 4/1997 Chen ............................ 2/461
5,966,747 A 10/1999 Crupi et al.
5,970,513 A 10/1999 Kocher
6,026,510 A 2/2000 Kocher
6,029,270 A 2/2000 Ost et al.
6,098,196 A 8/2000 Logan
6,108,813 A 8/2000 Tolliver et al.
6,446,273 B1 9/2002 Gillen et al.
6,453,791 B1 9/2002 Seitzinger
6,698,024 B1 3/2004 Graves et al.

FOREIGN PATENT DOCUMENTS

FR 2699265 6/1994

* cited by examiner

*Primary Examiner*—Tejash Patel
(74) *Attorney, Agent, or Firm*—Womble Carlyle Sandridge & Rice, PLLC

(57) **ABSTRACT**

A body armor accessory adds protection to unguarded areas of conventional body armor. The removable accessory comprises an axillary panel having a coverage area and is made of material that impedes the penetration of a foreign object. The accessory can be worn on either the left or right side of the wearer. The coverage area to the deltoid and flank areas of the wearer provided by the axillary panel is greater than that provided by the vest without the panel. A deltoid panel provides added protection to the deltoid area of the wearer.

**13 Claims, 7 Drawing Sheets**




**Appendix Item 1**




FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6A




FIG. 6B




FIG. 7

# BODY ARMOR

## GOVERNMENT LICENSE RIGHTS

The U.S. Government may have a paid-up license in this invention.

## FIELD OF THE INVENTION

This invention relates to body armor, and more specifically to improvements to protection for the axillary and other vulnerable regions of the body.

## BACKGROUND

Body armor has been used for centuries to protect areas of the body vulnerable to combative blows and projectiles. While the armor is intended to minimize injuries and fatalities that would otherwise result from such harmful events, the armor must also not interfere with the wearer's ability to carry out his duties with sufficient mobility and dexterity as may be required.

Traditionally body armor has been designed to assist in surviving attacks of known direction and source. For example, the Interceptor Multi-Threat Body Armor System went into production in 1999 and is made by Point Blank Body Armor of Oakland Park, Fla. The Interceptor, among other things, seeks to protect the major body organs from projectiles originating from sources in front or behind the wearer.

Threats to individual soldiers are developing from non-traditional sources.

Improvised Explosive Devices (IEDs) often are called "homemade" devices that are designed to cause death or injury primarily by use of explosives. IEDs can be produced in varying sizes, functioning methods, containers, and delivery methods. IEDs can utilize homemade explosives, or military ordnance and ordnance components. In the current conflict in Iraq, IEDs are accounting for a significant percentage of trauma cases and resulting causalities to coalition forces. The methods to counteract IEDs include eliminating the insurgents or terrorists that create the IEDs, improving the means for detecting and eliminating IEDs prior to detonation, altering the environment where IEDS may be located by, for example, increasing the armor protection of vehicles that may encounter IEDs, and improving the body armor that exposed individuals may wear.

Improvements to the body armor would minimize the effects of IEDs that may detonate, in spite of efforts to eliminate their creation. Injuries from IEDs can occur to the axillary, flank and deltoid body regions. Current body armor designs do not protect these exposed areas sufficiently to minimize the harm caused by IEDs and other threats. There is a need therefore for improved body armor that will protect exposed and vulnerable areas of the body from IEDs and other injury-causing projectiles, while retaining the requisite degree of mobility and dexterity that may be required.

## SUMMARY OF THE INVENTION

In accordance with a preferred embodiment of this invention, a removable body armor accessory adds protection to areas that conventional body armor leaves substantially unprotected. The accessory comprises an axillary panel having a coverage area and is made of material that impedes the penetration of a foreign object. The coverage area to the deltoid and flank areas of the wearer provided by the axillary panel is greater than that provided by the vest without the panel. A deltoid panel provides added protection to the deltoid area of the wearer. Both panels can be worn on either the left or right side of the wearer.



These and other aspects of the present invention will become apparent to those skilled in the art after a reading of the following description of the preferred embodiments, when considered in conjunction with the drawings. It should be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only and are not restrictive of the invention as claimed.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a perspective view of a body armor.

FIG. **2** shows a rear view of a body armor, with the wearer's arms in the outward, horizontal position.

FIG. **3** shows a side view of a body armor.

FIG. **4** is a deltoid panel.

FIG. **5** is an axillary panel.

FIGS. **6**A and **6**B show a body armor vest in an open position, with accessory panels attached thereto.

FIG. **7** shows an embodiment of a deltoid panel attached to an axillary panel.

## DETAILED DESCRIPTION

The body armor of this invention is shown and described in preferred embodiments in the description below.

As shown in FIGS. **1**, **3**, **2**, **6**A and **6**B, traditional body armor can comprise a Kevlar®-lined or other appropriated outfitted vest **10**. One such vest, known as the Interceptor Multi-Threat Body Armor System, is made up of two main modular components: the outer tactical vest **10** and the small-arms protective inserts (not shown). The inserts provide for additional protection, and fit within pockets (not shown) affixed to the vest **10**. The vest has arm holes **20** and a neck opening **30**. A plurality of loops and fasteners, such as shoulder loops **14** and interior loops **24**, can be provided for the attachment of various gear and equipment. A modular load bearing webbing system **12** can be included, as well as an emergency extraction strap **16**. Optional throat/neck and groin protectors (not shown) also are available. The Interceptor and other traditional body armor provide protection to anterior and posterior directed projectiles, and are credited with saving countless lives.

In embodiments of this invention, deltoid and axillary protector (DAP™) devices are provided that augment the traditional body armor by providing protection to previously under-protected areas of the body. The embodiment can consist of two modular panels or components; namely, a deltoid panel **100** and an axillary panel **200**. These panels provide protection but still allow the wearer free use of their arms and torso. Both panels preferably are made of soft, pliable materials capable of conforming to the natural shape of a wearer's shoulder and axillary regions. The panels also can be adaptable for wearing on the left or right side of the wearer.

As shown in FIG. **4**, the deltoid panel **100** can help protect the shoulder area from blast fragments and other foreign objects. The deltoid panel **100** is attached to the wearer's vest by way of any suitable connector. In an embodiment, the panel **100** is attached to the vest by attaching the strap **110** to the shoulder epaulet or shoulder loops **14** and by securing the strap **130** to the wearer's upper arm. The deltoid panel **100** attaches to the vest **10** by attaching the strap **110**

to the vest by any suitable means. Preferably, strap **110** is routed through the outer shoulder loop **14** of the vest **10**, and then secures to itself as shown in FIG. **1**. Hook and loop fasteners, e.g., Velcro®, can be used, in positions **112** and **116**, respectively, on the strap to also allow for various positioning and self-tightening upon the shoulder of the wearer.

Alternatively, strap **110** can be positioned under and around the vest shoulder **17** as shown in FIG. 6B. Velcro® fasteners **18** can be used under the shoulder section of the vest to help position and secure the strap **110**, before the strap **110** is looped around the shoulder portion **17** of the vest **10** as shown in FIG. 6B.

The securing strap **130** can also be positioned upon the deltoid panel to allow for placement around the arm nearer the bicep and elbow, and hence fitted to the desired arm girth. The deltoid panel should be large enough to cover a substantial portion of the deltoid, but also should be capable of securing around the arm snugly to avoid snagging on environmental objects while the wearer is in close quarters.

Although other fastening means can be used, a preferred embodiment shows again the use of hook and loop fasteners, e.g., Velcro®, to provide hooks **136** and pile **132** to accomplish fastening and sizing. Preferably, the deltoid panel weighs approximately 5 pounds or less. Alternatively, securing snaps (not shown) can be used to attach strap **110** to mating snaps on the shoulder portion of the vest. The deltoid panel **100** can be made of level II Kevlar, or any other suitable body armor material.

As shown in FIGS. **1**, **3**, **5** and 6A, an axillary panel **200** protects the axillary and flank regions by, in one embodiment, underlapping an area of the vest **10**. The axillary panel **200** can be secured to the inside shoulder of the vest **10** through any suitable connector, and worn under the arm. In a preferred embodiment, the axillary panel **200** can be secured to the vest using bands **210**. Bands **210** can attach to interior vest loops **24**, as shown in FIG. **6**. Hooks **212** and piles **216** can allow the bands to pass through the loops **24**, and attach upon the piles **216** on the panel for a secure fit. The bands can be adjustable in length by having long straps **210**, large surface area hook portions **212** and large surface area pile portions **216**. The axillary panel **200** can be made of Type IIIa Kevlar panel or other suitable protective armor. At the upper portion **215** of the axillary panel, the panel is shaped in an arcuate fashion in order to fit under the arm of the wearer, and provide some degree of both axillary **202** and flank **208** protection, as shown in FIG. **3**.

FIG. **7** illustrates another embodiment of this invention whereby a deltoid panel **101** and axillary panel **201** appear in modified shapes and are connected to one another by use, for example, of an adjustable supporting strap **180** and strips **190**, all of which can be elastic. A retaining strap **290** attaches the axillary panel **200** to the vest **10** to an interior loop (not shown). The wearer's arm slips through opening **195**, allowing the deltoid panel to sit atop the shoulder, and axillary panel **201** to cover the underarm and flank regions.

During use, the axillary panel fits under the vest **10**, and helps protect the underarm **202** and flank **208** regions of the wearer. In a preferred embodiment, the axillary protector **200** underlaps the vest **10** to ensure a good fit and avoid snagging the exposed panel on objects. Nevertheless, the benefits of this invention also will result if the panel overlaps the vest **10**. In use, the axillary panel protects the wearer's axillary regions when his or her arms are approximately horizontal as shown in FIG. **3** raised or lifted upwards. These are common positions, for example, for a turret gunner when in the travel position and for a driver.

In another preferred embodiment, the axillary panel and/or the deltoid panel can be integral to the vest, but expandable in such a way that the coverage area for the axillary or deltoid areas are covered by use, for example, of an accordion or pleated panel that is part of the vest itself.

This invention offers mobility, and universal fit. The invention also is simple to demonstrate, and easily is removed and attached by soldiers in the field to either their right or left sides. If preferred, multiple sets can be used on both arms and shoulders. The invention does not encumber the user from engaging in a firing position, and other combat ready positions and maneuvers required in the field. It is lightweight, weighing approximately 5 pounds per panel in a preferred embodiment. The panels could be made in any suitable colors required by the usage, such as desert or woodland camouflage patterns.

Many personnel can benefit from the added protection provided by this invention. Drivers and passengers (included mounted troops) of armored and unarmored vehicles can benefit from these improvements to body armor. Turret gunners in armored and unarmored vehicles will appreciate the added protection. Occupants of boats, helicopters, tanks, light armor vehicles, and even dismounted troops will benefit from this invention. Non-military personnel, including contract personnel, law enforcement, corrections officers, tactical and private security forces also will benefit from the protection offered by this invention. Further usages include explosive ordinance disposal, athletic activities, and animal training and detaining.

During the development and testing of this invention in Iraq, the axillary panel successfully stopped a fragment from entering a wearer's chest cavity. This wearer was in the gunner position on a Light-Medium Tactical Vehicle (LMTV). Upon detonation of an IED placed by hostile forces, the vehicle cab sustained major damage. The gunner was wearing the standard issue Interceptor Body Armor vest, augmented by the axillary panel. Approximately a 1 inch metal shrapnel was stopped by the axillary panel, after the shrapnel penetrated an existing layer of the Interceptor vest. A fragment of this size is sufficient to sever major arteries in and around the heart and lungs, causing permanent injury and possibly death. The gunner was able to avoid serious injury and possible death, and returned to active duty following the incident.

The panels described herein can have be comprised of an outer shell layer that enclose an insert containing one or more sheets of ballistic resistant materials, as are well known in the art. The materials comprising the outer layer and ballistic sheets can be of any suitable materials given the desired usage conditions and environments. Additional hooks, loops and reflectors can be added as desired.

While preferred embodiments of the present invention have been described above, it is to be understood that any and all equivalent realizations of the present invention are included within the scope and spirit thereof. Thus, the embodiments depicted are presented by way of example only and are not intended as limitations upon the present invention. While particular embodiments of the invention have been described and shown, it will be understood by those of ordinary skill in this art that the present invention is not limited thereto since many modifications can be made. Therefore, it is contemplated that any and all such embodiments are included in the present invention as may fall within the literal or equivalent scope of the appended claims.

We claim:

**1**. A body armor accessory, for use with a body armor vest, comprising

a. an axillary panel having a underarm coverage area, the panel being operable to be connected to the vest;

b. the panel being made of ballistic material that impedes the penetration of at least one foreign object;

c. the axillary panel is proximate to a wearer's chest when at least one of the wearer's arms is raised;

wherein the coverage area provides greater protection to an axillary area of the wearer than that provided by the vest without the panel.

**2**. The body armor accessory of claim **1** further comprising a connector that attaches the panel to the vest.

**3**. The body armor accessory of claim **2** whereby the connector is configured to allow for attachment to either a right or left side of the vest.

**4**. The body armor accessory of claim **1** whereby the panel is designed to be worn under the vest.

**5**. The body armor accessory of claim **1** further comprising

a. a deltoid panel having a coverage area;

b. the deltoid panel being made of material that impedes the penetration of at least one foreign object

whereby the deltoid coverage area provides greater protection to an deltoid area of a wearer than that provided by the vest without the deltoid panel.

**6**. The body armor accessory of claim **5** whereby the deltoid panel is capable of attachment to the vest.

**7**. The body armor accessory of claim **5** whereby the deltoid panel further is configured to allow the deltoid panel to secure to the wearer's arm.

**8**. The body armor accessory of claim **5** whereby the deltoid panel is capable of being worn on either the left or right side of the vest.

**9**. A body armor comprising

a. a vest having a neck opening and two arm openings;

b. an axillary panel having a underarm coverage area, the panel being made of ballistic material that impedes the penetration of at least one foreign object;

c. the axillary panel is proximate to a wearer's chest when at least one of the wearer's arms is raised;

wherein the axillary panel coverage area provides greater protection to an axillary area of the wearer than that provided by the vest without the panel.

**10**. The body armor of claim **9** whereby the coverage area of the vest for the wearer's axillary region is a first coverage area, and the coverage area of the panel is a second coverage area, and the first coverage area and the second coverage area overlap.

**11**. The body armor of claim **9** further comprising

a. a deltoid panel having a coverage area;

b. the deltoid panel being made of material that impedes the penetration of at least one foreign object

whereby the deltoid coverage area provides greater protection to an deltoid area of a wearer than that provided by the vest without the deltoid panel.

**12**. The body armor accessory of claim **11** whereby the deltoid panel is attached to the vest.

**13**. The body armor accessory of claim **11** whereby the deltoid panel further is configured to allow the deltoid panel to secure to the wearer's arm.

* * * * *

UNITED STATES DEPARTMENT OF COMMERCE
BEFORE THE UNDER SECRETARY FOR TECHNOLOGY

Christopher S. Van Winkle and David A. Cox,

Appellants,

v.

Department of the Army,

Appellee.

## DECISION ON APPEAL FROM GOVERNMENT EMPLOYEE RIGHTS DETERMINATION

This is an appeal by Christopher Sean Van Winkle and David Alan Cox under 37 CFR 501.8 from a determination by the Department of the Army (Army) that the Government shall have a royalty-free license in their invention. The invention is described in U.S. Patent 7,076,806, which issued July 18, 2006 on an application filed by the inventors on December 30, 2004, and which contains an acknowledgment that the Government may have a paid-up license. The first Army employee rights determination found that the inventors were entitled to retain ownership of the invention subject to a Government license. That determination was vacated and remanded to Army by the Acting Under Secretary for Technology on February 13, 2006, with instructions to consider all relevant information submitted after the initial rights determination was made by Army.

Subsequently, on April 3, 2006, Army again determined that the Government was entitled to a royalty-free license in the invention, and the inventors again appealed on May 4, 2006. A hearing was held before the Under Secretary for Technology on November 15, 2006.[1]

The determination is Vacated and Remanded.

## Background

### A. Facts

In 2003, Christopher Sean Van Winkle and David Alan Cox ("the inventors") observed, while serving as Physician Assistants

[1] Army was represented by Alan P. Klein and the inventors by Jack B. Hicks. An earlier hearing was held on August 17, 2005.

in the 82nd Army Airborne Division stationed near Fallujah, Iraq, that many of the soldiers they treated experienced serious wounds in the upper torso even though they were wearing body armor. They observed that these wounds were due to shrapnel from Improvised Explosive Devices(IEDs)hitting the soldiers in unprotected areas in the flank, shoulder and deltoid. Working approximately 50 hours while off duty in their barracks, the inventors designed modifications (flaps and panels)[2] to an existing interceptor body armor (or bullet proof) vest. The modifications were intended to provide improved coverage for areas around the soldier's arms, which were left exposed by the existing body armor. The modifications were designed to fit in a way that would not unduly restrain the range of motion of the soldier's arms and torsos while in combat.

One embodiment of the invention was a panel inserted inside the vest under one or both of the armpits and suspended by retainer loops sewn in the vest. This was called an axillary panel. Another embodiment was a fold-over epaulet of flexible but strong material to be attached under the collar assembly by hook-and-loop fasteners (Velcro strips) on one or both shoulders and secured around either or both arms by similar strips. The latter strips are expandable so as to fit any size of arm. This was called a deltoid panel or flap. When both embodiments were a part of a body armor vest, the invention was called a deltoid axillary protective device or DAP.

On September 20, 2003, the inventors made a cardboard model of the DAP and disclosed the concept to Lt. Col. George K. Bal, MD, an orthopedic surgeon, Captain McDonald, and Major Courtines. Van Winkle also made a drawing of the DAP in September 2003 and showed it to Lt. Col. Bal and Major Courtines.[3] Bal and Van Winkle prepared a memorandum dated October 27, 2003 describing the DAP.[4] The record also contains a copy of another drawing[5]

---

[2] *See* inventors' affidavits of November 22, 2004. According to the inventors many attempts were made to design the modifications.

[3] A copy of this undated drawing was attached to Van Winkle's supplemental affidavit of January 21, 2005.

[4] A copy of the draft memorandum was attached to the inventors' reply of September 21, 2005. This memorandum included an idea to use the groin flap as the axillary panel.

[5] A copy of this undated drawing was attached to Van Winkle's supplemental affidavit of January 21, 2005 and described as representative of the cardboard model of the deltoid portion of the DAP.

and a photograph[6] of the cardboard model of the deltoid panel.

Several months later, the Command instructed the inventors to go to the 82nd Airborne rigger shop at FOB Ridgeway and work with two parachute riggers to produce a prototype DAP. The prototype was finished in several hours using a small amount of scrap ballistic nylon and 12 inches of Velcro tape. The pattern was drawn by Van Winkle on the nylon and given to the riggers to be cut and sewn per the inventors' instructions.[7]

The riggers subsequently made 40 DAPs and gave them to the 1st Battalion 505th Parachute Infantry Regiment to test the ergonomics of the device.[8] In the first field test sometime in late December 2003 or early January 2004, a soldier wearing a DAP was struck by shrapnel from an IED but walked away without a scratch.[9] A piece of shrapnel penetrated the initial layer of the body armor but was stopped by the DAP. The DAPs were so popular that soldiers refused to return the prototypes.[10] The 82nd Airborne Division approved the prototype and quickly sought to have it mass produced. In June 2004, a 3-year contract for $239.4 million was awarded to Point Blank Body Armor Inc., to produce vests modified with the DAP. The final design of the modified vest was approved in just 10 hours.[11]

B. <u>The Invention</u>

As noted above, the DAP invention relates to coverage with ballistic material of the flank, shoulder and deltoid areas of a soldier wearing a body armor vest. One embodiment of the invention consists of a panel fitted inside the armor and suspended by loops sewn inside the armor. The straps are adjustable to accommodate any size of arm. Another embodiment is a deltoid flap attached under the collar assembly and around

---

[6] The photograph was attached to the inventors' reply of September 21. 2005.

[7] *See* the inventors' reply of September 21, 2005 and their affidavits of November 22, 2004.

[8] *See* the February 7, 2004 issue of <u>The Canopy</u>, entitled "GI Innovation Saves Lives," attached to the inventors' first notice of appeal dated November 22, 2004.

[9] *Id.*

[10] *See* the inventors' affidavits of November 22, 2004.

[11] *See* August 2004 article by Barbara Perkins on Point Blank Body Armor, submitted with inventors' notice of appeal, http://www.findarticles.com/p/articles/mi_m0OQD/is_8_7/ai_n6181024/print, accessed November 11, 2004.

either or both arms, secured in place with Velcro strips.

C. The Invention Rights Questionnaires

A substitute Invention Rights Questionnaire, DA Form 2871 dated March 10, 2006,[12] reveals the following:

(1) The inventors spent fifty hours of their own time and no Government time in making the invention.

(2) A written description of the invention was made on September 20, 2003.

(3) A model was made on September 20, 2003 because "it was desired to test the operability or practicality of the invention."

(4) No Government contributions of facilities, equipment, materials or information were identified.

(5) Neither inventor was employed or assigned to:

(a) invent, improve or perfect any process;
(b) conduct or perform research or development;
(c) supervise, coordinate or review research and development; or
(d) act in a liaison capacity for research and development.

(6) Major Michel-Alexis Courtines, MD, Brigade Surgeon, 3rd Brigade, 82nd Airborne Division, and the inventors' supervisor at the time of the invention, concurred with their statements in the rights questionnaire. Major Courtines indicated that the invention was unrelated to the inventors' duties, which, as Physician Assistants (65D5P), were to treat all sick, wounded or injured U.S. and Coalition soldiers as well as any captured enemy or wounded civilians in Iraq. He also stated that the inventors could continue development work on the invention as a Government project without any approval.

The rights questionnaire submitted to Army on August 12, 2004 differed from the 2006 questionnaire only by identifying in section 11 various Government contributions to the invention, including the use of two Army parachute riggers, an Army sewing machine in an Army facility, Army scrap ballistic nylon and Velcro tape worth up to $10 to make a prototype in 4 hours. This is contrasted with the negative in question (4), above. The

---

[12] According to the inventors' appeal of May 4, 2006, they submitted the first rights questionnaire on January 31, 2004, which was lost by Army. They then resubmitted the first questionnaire on August 12, 2004.

questionnaire was signed on August 6, 2004 by Major Courtines, who concurred with the statements by the inventors.

D. Army's Rationale Justifying Taking of a License

In its determination dated April 3, 2006, Army found that because the invention was made with its contribution of facilities, equipment, material and time of other Government employees during normal working hours, it could require title to be assigned to the Government, or alternatively could require the inventors to grant a royalty-free license to the Government. Thus, Army found that even though there was no presumption of an assignment to the Government arising from the inventors' duties as Physician Assistants, the Government could still require title to be assigned to it because of Army's contribution to the invention. However, because Army[13] indicated that it did not have sufficient interest to file a patent application, the inventors were permitted to retain ownership to their invention, subject to a royalty-free license to the Government, as provided for in the Executive Order.

Based upon the evidence,[14] Army concluded that the inventors "constructed a cardboard template on 20 September 2003, and nothing more, and did not construct a prototype of their invention until December of 2003, when they constructed a prototype of ballistic nylon with the help of the Army riggers."[15] Army disagreed that the invention was made in September 2003 but found rather that it was made after December 2003, when the inventors used Army riggers to help them cut and sew together a prototype from ballistic nylon, which was subsequently tested successfully on a soldier in the field.[16]

In response to a request made on behalf of the Under Secretary for Technology by the Patent Counsel for the Department of Commerce on August 8, 2006, Army submitted an affidavit on September 7, 2006 by Matthew S. Burkins, an armor expert. Mr. Burkins testified that the cardboard model did "not demonstrate that the device would work for its intended purpose without

---

[13] The Army Research Laboratory.

[14] Army's determination of April 3, 2006 considered both invention rights questionnaires, affidavits by the inventors dated November 22, 2004, their supplemental affidavits dated January 21, 2005 and an affidavit by Robert A. Coffelt, an expert on armor, submitted on behalf of the inventors. Army also considered three photographs and two drawings of the DAP and a copy of the patent application on the DAP, as filed.

[15] Invention Rights Appeal Report, May 12, 2006, page 3.

[16] *Id.*

further testing" because "[t]he state-of-the art in body armor technology is not advanced to the point that final ballistic performance can be predicted prior to testing." On September 28, 2006, the inventors submitted a rebuttal affidavit by their expert Coffelt, who explained that although it is understandable that the Army might want to conduct its own testing prior to purchasing the body armor, the particular invention was not a new specification but "simply to provide coverage to a currently unprotected area with some kind of ballistic material."[17]

## Issue on Appeal

Because the Army concedes that the inventors' duties were not such as to presume an assignment of title in the invention to the government, the issue to be decided on appeal is whether or not the Army has any rights in the invention arising from a Government contribution to the invention. If a Government contribution was made, based upon the Army's earlier finding that the inventors did not have R&D duties, the presumption is that title remains with the inventors, but that the Government is entitled to, at least, a license in the invention.[18]

However, if no Government contribution was made, title and all rights to the invention properly would remain with the inventors. Thus, since there is no dispute that the invention was conceived without any Government contribution, the specific question is whether or not the government made a contribution to the first actual reduction to practice[19] of the invention.[20] The inventors maintain that since the cardboard model DAP was the first actual reduction to practice, there was no government contribution to the invention. Army argues that the cardboard model was not a reduction to practice and that the reduction to practice did not occur until a later date, with the contribution

---

[17] See <u>Declaration of Robert Coffelt</u>, September 28, 2006, paragraph 7. Van Winkle and Cox submitted an earlier affidavit from Robert Coffelt dated January 5, 2005 declaring that in his opinion, based upon the cardboard model of September 2003, "someone skilled in the art of body armor would understand that the DAP would work for its intended purpose without any further testing." (<u>Affidavit of Robert Coffelt</u>, January 6, 2005, paragraph 6).

[18] *See* 37 CFR 501.6(3)

[19] *See* 37 CFR Part 501.6. *Also see infra* discussion pp. 8-9.

[20] "Made", as used in Executive Order 10096 is not defined. It was first defined by the Patent and Trademark Office in 1987 to be the "conception or first actual reduction to practice" of an invention. <u>In re King</u>, 3 USPQ2d at 1751. The definition was later codified in 37 CFR 501.3(e) in 1996.

of government resources.

## Analysis

The inventors contend that Army made no contribution to the making of the invention because the invention was made - both conceived and first actually reduced to practice - before any Army resources were used.[21] There is no dispute that the invention was conceived without any Government contribution. The inventors maintain that the cardboard model of the DAP, which they made on their own time in September 2003, was both the conception and first actual reduction to practice of the invention. The inventors point out that during the course of performing their duties as medics they discovered from the nature of the wounds they treated that the body armor worn by the soldiers was deficient. Then, they designed the DAP during their free time.[22] In support of their position, the inventors submitted an affidavit by Coffelt,[23] who declared under oath on January 26, 2005 that at the time the cardboard model of the DAP

---

[21] This is not the first rights appeal when an employee has asserted that the invention was made before the use of any Government contribution. In King, the Government was found to be entitled to a license because the Air Force tested a pallet coupler prototype made by an Air Force forklift operator. In Farley v. NASA, 37 USPQ2d 1347 (Dept. of Commerce 1993), the Government was held to be the owner because the inventor, a materials engineer, made a wooden model of the invention at work with another employee. In Flanagan v. Department of Army, 65 USPQ2d 1478 (Dept. of Commerce 2002), the Government was found to own an invention by an environmental science officer because he reduced to practice a computer information system for soldiers to avoid heat induced casualties using Government supplies and funds at work. In Schroeder, 3 USPQ2d 1057 (Comm. Pat. 1986), the Government was held to own a light pen invention by a research psychologist because of the Government time he used to develop a prototype target marksmanship trainer for the Army. Finally, in In re Scalese, 3 USPQ2d 1231 (Comm. Pat. 1986), the Government was found to own a probe invention to inspect for cracks in aluminum holes because the Air Force employee tested it on Government time and in Government facilities. Each of these cases, however, turned on fact-specific issues which allowed the court to find a Government contribution to the respective inventions. As such, the government was entitled to an interest in the invention. In this case, we believe that there is no such governmental contribution.

[22] *See* inventors' affidavits: Affidavit of David Cox dated 22 November 2004, and Affidavit of Christopher Van Winkle dated 22 November 2004.

[23] *Id.* at footnote 17.

was completed in September 2003, "someone skilled in the art of body armor would understand the DAP would work for its intended purpose without any further testing." Coffelt further explained that "given the nature of the DAP's design, ballistic testing was not required because the ballistic performance of the planned construction materials was already proven and widely in use."

The inventors have asserted that all the claims of the patent are supported by the cardboard model.[24] Army, in its response of August 28, 2006, pointed out that all the patent claims relate to body armor whether in the preamble (claims 1-8, 12 and 13) or the body of claim (claims 9-11). Army further asserted that since the cardboard model was neither a body armor accessory nor body armor, it could not constitute a first actual reduction to practice of the patented invention.

Although a model is generally evidence of conception and not reduction to practice,[25] the question here is whether the model is also a reduction to practice. The extent to which testing is needed to establish a reduction to practice is a matter to be decided on case-by-case basis. King, 3 USPQ2d at 1750.

To help determine whether or not the cardboard model was a reduction to practice and to help determine whether or not more testing was needed to establish a reduction to practice, it is useful to examine what the patented invention is claimed to be.[26] The independent claims of the patent, claims 1 and 9, are both directed towards axillary panels made of a "ballistic material that impedes the penetration of at least one foreign object . . ." where the coverage provides ". . . greater protection to an axillary area of the wearer than provided by the vest without the panel." Dependent claims 5 and 11 refer to a "material that impedes the penetration of at least one foreign object. . . wherein the axillary panel overage area provides greater

---

[24] *See* inventors' responses of September 21, 2005 and August 23, 2006.

[25] *See* Farley v. NASA 37 USPQ2d 1347m 1349 (Dept. of Commerce 1993. *See also* Scott et al. V. Finney, 34 F.3d 1058, 1061 (Fed. Cir. 1994)("To show reduction to practice, the junior party must demonstrate that the invention is 'suitable for its intended purpose.'")

[26] Ordinarily, rights determinations or appeals from them do not focus on patent claims because the determinations are usually made prior to filing a patent application. *See* In re Kirkland, 230 USPO 477 (Comm'r Pat. 1986). We note that in King, there was no discussion of the claims although there was a patent. We think the claims are important in this appeal because they demonstrate what the invention actually is - and that is critical to the outcome of this appeal.

protection to an axillary area of the wearer than that provided by the vest without [the panel]."

From the claims of the patent, we learn that the invention is to provide "greater protection to any axillary area of the wearer than provided by the vest without the panel." The patent is not directed towards a new or improved ballistic material, or even towards a particular type of ballistic material, but rather it is directed towards improved coverage using any ballistic material that "impedes the penetration of at least one foreign object."

## Conclusion

Improved coverage is a clear and direct result of the model. Further, based upon the Patent Specification, the invention does not have to work flawlessly, it simply must offer improved protection to the user.

Army has argued that a paper model to deflect IEDs cannot be a reduction to practice until it is made of ballistic material and is tested. However, the fact that the model was made out of a different material than the body armor "is relevant only to the extent it indicates that the inventor could not, from the purported reduction to practice, have determined that the invention would work for its intended purpose." Slip Track Systems, Inc. V. Metal-Lite, Inc., 304 F.3d 1256, 1268, 64 USPQ2s 1423, 1431 (Fed. Cir. 2002).[27] As noted above, we believe that the inventors could have determined that the invention would work for its intended purposes, that is, improved coverage, based simply upon construction of the model.

Further supporting the inventors' claim that the model was a reduction to practice, there is no evidence in the record that the design changed in any significant way after the cardboard model was constructed. Indeed, from the testimony provided, a prototype was made in only 1½ hours and the DAP went into production without further research and development by the Army. This indicates that the design of the DAP was simple and that it would work as intended, that is, to provide improved coverage.[28]

---

[27] Slip Track was an interference case where the Federal Circuit reversed the lower court and found that there was sufficient evidence of a reduction to practice in favor of Slip track's cardboard prototype to support a remand.

[28] *See* Eastern Rotocraft Corp. V United States, 384 F.2d 429, 431 (Ct. Cl. 1967) (Some Devices are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate their workability") *and* Gordon v. Hubbard et al., 347 F.2d 1001, 1006 (C.C.P.A. 1965) ("In all of the cases in which this court has reviewed whether sufficient and

The evidence showed that the inventors made a cardboard model of the DAP and disclosed it to Lt. Col. George K. Bal, MD, an orthopedic surgeon, Captain McDonald and Major Courtines on September 20, 2003. The inventors further showed the drawing of the DAP in September 2003 to Lt. Col. Bal and Major Courtines. We conclude that the evidence indicates that the first reduction of practice of the DAP was in September 2003.

We find that, in this case, the cardboard model was not only indicative of a conception but it also was a reduction to practice since one of ordinary skill in the art of body armor could have determined that the invention would work for its intended purpose, improved coverage, based solely upon the model. We agree with inventors that the claims of the patent are supported by the cardboard model and that further testing was not necessary to establish the reduction to practice. We therefore conclude that the invention was not made during work hours or with a contribution by the Government of facilities, equipment, materials, funds or information, or time or services of other Government employees on official duty, and that the invention does not bear a direct relation to and was not made in consequence of the official duties of the inventors.

---

proper testing has occurred to establish a reduction to practice, we have taken pains to point out that the nature of testing required depends on the specific facts of the case. A certain amount of 'common sense' must be applied in determining the extent of testing . . . In instances where the invention is sufficiently simple, mere construction or synthesis of the subject matter may be sufficient to show that it will operate satisfactorily.") *See also* Slip Track, supra, 304 F.3d at 1267, 64 USPQ2d at 1430 ("Testing is required to demonstrate reduction to practice in some instances because without such testing there cannot be sufficient certainty that the invention will work for its intended purpose.")

DECISION

The determination by the Army that the Government is entitled to a royalty-free license in the above-identified invention is vacated and remanded to the Army. Any request for reconsideration or modification of this decision must be filed within thirty (30) days from the date below.

Date: 3/20/07

Robert C. Cresanti
Robert Cresanti
Under Secretary for Technology

cc: Jack B. Hicks
Womble Carlyle Sandridge & Rice, PLLC

Alan P. Klein
Intellectual Property Counsel of the Army
Office of The Judge Advocate General
Department of the Army

UNITED STATES DEPARTMENT OF COMMERCE
BEFORE THE UNDER SECRETARY FOR TECHNOLOGY

Christopher S. Van Winkle and )
David A. Cox, )
)
Appellants, )
)
v. )
)
Department of the Army, )
)
Appellee. )
)

DECISION ON REQUEST FOR RECONSIDERATION OF
DECISION ON APPEAL FROM EMPLOYEE RIGHTS DETERMINATION

The Department of Commerce has reviewed the Request for Reconsideration from the Department of the Army, dated March 27, 2007, and the Inventor's Response to the Request for Reconsideration from the Department of the Army, dated April 18, 2007. After considering the arguments raised in these documents, it has been determined that no new substantive facts or arguments were presented by the Department of the Army. Accordingly, the decision of March 20, 2007 in the Decision on Appeal From Government Employee Rights Determination is affirmed.

Date: 5/1/07

Robert C. Cresanti
Robert Cresanti
Under Secretary for Technology

cc: Alan P. Klein
Intellectual Property Counsel of the Army
Office of the Judge Advocate General
Department of the Army

Jack B. Hicks
Womble Carlyle Sandridge & Rice, PLLC

**AWARD/CONTRACT**

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) — RATING: DO-C9 — PAGE 1 OF PAGES 9

2. CONTRACT (Proc. Inst. Ident.) NO.: W91CRB-04-D-0014

3. EFFECTIVE DATE: 07 Jun 2004

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.:

5. ISSUED BY — CODE W91CRB
ROBERT MORRIS ACQ CTR - W91CRB
MISSIONS DIVISION
ATTN: AMSRD-ACC-U
4118 SUSQUEHANNA AVENUE
ABERDEEN PROVING GROUND MD 21005-3013

6. ADMINISTERED BY (If other than Item 5) — CODE S1212A
DCMA SOUTH FLORIDA - HOLLYWOOD - S1212A
3100 HOLLYWOOD BLVD SUITE 310
HOLLYWOOD FL 33024-7961

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, state and zip code)
POINT BLANK BODY ARMOR, INC
4031 N.E. 12TH TERRACE
OAKLAND PARK FL 33334

CODE 62283 — FACILITY CODE

8. DELIVERY
[ ] FOB ORIGIN [ X] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: — ITEM

11. SHIP TO/MARK FOR — CODE
See Schedule

12. PAYMENT WILL BE MADE BY — CODE HQ0303
DFAS ROCK ISLAND - HQ0303
BUILDING 68
ROCK ISLAND IL 61299

DFAS RI

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
[ ] 10 U.S.C. 2304(c)( ) [ ] 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA
See Schedule

| 15A. ITEM NO. | 15B. SUPPLIES/ SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | **SEE SCHEDULE** | | | | |

15G. TOTAL AMOUNT OF CONTRACT: $239,400,000.00

16. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/ CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 8 - 9 |
| X | B | SUPPLIES OR SERVICES AND PRICES/ COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS | |
| X | C | DESCRIPTION/ SPECS./ WORK STATEMENT | 3 - 5 | | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 6 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| | F | DELIVERIES OR PERFORMANCE | | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 7 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. [ ] CONTRACTOR'S NEGOTIATED AGREEMENT Contractor is required to sign this document and return ___ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [ X] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number REF: W91CRB-04-T-0129 including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)
SANDRA HAtfield C.O.O.

20A. NAME AND TITLE OF CONTRACTING OFFICER
KATHRYN J. BANKERD / CONTRACTING OFFICER
TEL: 410-278-0864 EMAIL: Kathy.Bankerd@apg.army.mil

19B. NAME OF CONTRACTOR
BY Sandra Hatfield
(Signature of person authorized to sign)

19C. DATE SIGNED: 6/7/04

20B. UNITED STATES OF AMERICA
BY Kathryn J Bankerd
(Signature of Contracting Officer)

20C. DATE SIGNED: 07-Jun-2004

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE
26-107
GPO 1985 O - 469-794
STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

Appendix Item 4

Section B - Supplies or Services and Prices

MIN/MAX

B.1 TYPE OF CONTRACT

a. The basic contract is issued on an Indefinite Quantity/Indefinite Delivery basis in accordance with FAR 16.504.

b. Individual delivery orders issued under the basic contract shall be on a firm fixed price basis.

B.2 CONTRACT MINIMUM AND MAXIMUM LIMITATIONS

a. The government is obligated to place, with the contractor, a delivery order(s) in the amount which will total at least 50,000 each.

b. The governemnt may place additional delivery orders with the contractor for a not-to-exceed maximum of 840,000 each.

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---|---|---|---|---|---|
| 0001 | | 840,000 | Each | $285.00 | $239,400,000.00 |
| | GSA Contract No. #GS-07F-8942D<br>FFP<br>INTERCEPTOR Body Armor Extremity Protection:<br>Deltoid and Axillary Protectors, Desert<br>See Fact Sheet. | | | | |

The term of this contract shall commence on the date of award and continue through 36 months thereafter. The delivery schedule will be stated in each Delivery Order.

MAX NET AMT $239,400,000.00

ACRN AA Funded Amount $0.00

FOB: Destination

Section C - Descriptions and Specifications

FACT SHEET

## FACT SHEET

### INTERCEPTOR Body Armor (IBA) Program
**Extremity Protection**
**Deltoid and Axillary Protectors (DAP)**

**OVERVIEW:** During Operation Iraqi Freedom combat operations, an increased threat has been encountered because of the extensive use of IED's by terrorist insurgents. Whereas the Outer Tactical Vest (OTV) of the IBA provides torso protection from the fragmentary effects of IED's, a shortfall in the under arm and upper arm areas not currently covered by the IBA was identified by combat commanders and medical personnel. To meet this threat and provide an increased level of protection, the DAP was developed.

**DESCRIPTION:** The DAP consists of two ambidextrous modular components, the Deltoid (Upper Arm) Protector and the Axillary (Under Arm) Protector. The Deltoid Protector attaches at the shoulder of the OTV and is secured around the wearers arm with a strap. The Axillary Protector is worn under the OTV and is attached to the underside of the shoulder portion of the OTV and to the interior adjustment strap on the lower side of the OTV. The DAP will be issued in sets, which consists of two (2) each Deltoid and Axillary Protectors.

**COMPONENT MATERIALS:** Cordura and Kevlar.

**COLOR:** Desert

**WEIGHT:** 5.3 lbs per set

**SIZE:** One size fits all.

SPECIAL INSTRUCTIONS

**BERRY AMENDMENT:**

PRODUCTS PROVIDED MUST BE IN COMPLIANCE WITH THE "BERRY AMENDMENT" ENACTED AS SECTION 9005 OF THE DEPARTMENT OF DEFENSE APPROPRIATION ACT, 1993 (P.L. 102-396) IN THAT ALL COMPONENTS OF THE ITEM ARE TO BE "GROWN, REPROCESSED, REUSED, OR PRODUCED IN THE UNITED STATES".

**INSPECTION AND ACCEPTANCE BY THE GOVERNMENT:**

(a) Saving and reserving to the Government all rights under the inspection provision, the following is applicable to this acquisition: Inspection and acceptance at Contractor's plant upon execution of DD Form 250 by the authorized Government representative.

(b) Inspection and acceptance at source by cognizant Defense Contract Management Agency (DCMA). Office responsible for performance of inspection is DCMA, South Florida – Hollywood
Phone: 954-987-7468 exts. 200, 201, or 204
FAX: 954-961-2229

(c) Inspection will be performed at: 202 SW 2nd St., Pompano Beach, FL 33069.

(d) Notwithstanding the foregoing designation of destination as the place for inspection and acceptance of suplies furnished hereunder, the Government reserves the right to require inspection and acceptance at Contractor's plant. Said right may be exercised either before award or during the course of performance, only the undelivered portion of the delivery order quantities will be subject to inspection and acceptance at Contractor's plant.

**MATERIAL INSPECTION AND RECEIVING REPORT DD FORM 250:**

Material Inspection and Receiving Report DD Form 250 to be sent to the following address:

PM Soldier Equipment
ATTN: SFAE-SDR-SEQ/Gerry Mosier
10170 Beach Road
Ft. Belvoir, VA 22060

**SHIPPING ADDRESS:**

DODAAC: W912H7
PM Soldier Equipment Staging/NET Facility
7142 Lineweaver Rd., Bldg 2400
Warrenton, VA 20187-5000
M/F: Contract # W91CRB-04-D-0014

**INVOICE INSTRUCTIONS:**

The contractor shall **fax all invoices to the Contracting Officer's Representative (COR)** as listed below. Upon receipt, the COR will review invoices for accuracy, certify for payment and forward to the appropriate DFAS office in Block 12 of SF 26 (cover page). The Fax number for DFAS Rock Island is 309-782-9144/9994/9997.
**INVOICES MUST INCLUDE SHIPPING COMPANY AND TRACKING NUMBER.**

**CONTRACTING OFFICER'S REPRESENTATIVE:**

Ms. Gerry Mosier
Phone: 703-704-2803
FAX: 703-704-0037
Email: gerry.mosier@peosoldier.army.mil

**ACQUISITION POINT OF CONTACT:**

Sherri Comer
U.S. Army Robert Morris Acquisition Center
Building 4118
Susquehanna Boulevard
Aberdeen Proving Ground, MD 21005-5001
Phone: 410-278-0867
Fax: 410-306-3710
Email: sherri.comer@us.army.mil

Section E - Inspection and Acceptance

INSPECTION AND ACCEPTANCE TERMS

Supplies/services will be inspected/accepted at:

| CLIN | INSPECT AT | INSPECT BY | ACCEPT AT | ACCEPT BY |
|---|---|---|---|---|
| 0001 | Origin | Government | Origin | Government |

Section G - Contract Administration Data

## ACCOUNTING AND APPROPRIATION DATA

AA: To be cited on individual delivery orders.
AMOUNT: $0.00

Section I - Contract Clauses

CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 52.203-11 | Certification And Disclosure Regarding Payments To Influence Certain Federal Transactions | APR 1991 |
| 52.211-15 | Defense Priority And Allocation Requirements | SEP 1990 |
| 52.232-33 | Payment by Electronic Funds Transfer--Central Contractor Registration | OCT 2003 |
| 52.246-2 | Inspection Of Supplies--Fixed Price | AUG 1996 |
| 52.247-34 | F.O.B. Destination | NOV 1991 |
| 52.247-48 | F.O.B. Destination--Evidence Of Shipment | FEB 1999 |
| 52.252-2 | Clauses Incorporated By Reference | FEB 1998 |
| 252.204-7004 Alt A | Required Central Contractor Registration Alternate A | NOV 2003 |
| 252.225-7012 | Preference For Certain Domestic Commodities | MAY 2004 |

CLAUSES INCORPORATED BY FULL TEXT

52.211-16 VARIATION IN QUANTITY (APR 1984)

(a) A variation in the quantity of any item called for by this contract will not be accepted unless the variation has been caused by conditions of loading, shipping, or packing, or allowances in manufacturing processes, and then only to the extent, if any, specified in paragraph (b) below.

(b) The permissible variation shall be limited to:
0% Percent increase
0% Percent decrease
This increase or decrease shall apply to CLIN 0001 and funded subclins.

(End of clause)

52.216-18 ORDERING. (OCT 1995)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from date of contract award through 36 months [insert dates].

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

(End of clause)

52.216-19 ORDER LIMITATIONS. (OCT 1995)

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than 50,000 (insert dollar figure or quantity), the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(b) Maximum order. The Contractor is not obligated to honor:

(1) Any order for a single item in excess of 200,000 (insert dollar figure or quantity);

(2) Any order for a combination of items in excess of 840,000 (insert dollar figure or quantity); or

(3) A series of orders from the same ordering office within 10 days that together call for quantities exceeding the limitation in subparagraph (1) or (2) above.

(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) above.

(d) Notwithstanding paragraphs (b) and (c) above, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within 10 days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

(End of clause)

52.216-22 INDEFINITE QUANTITY. (OCT 1995)

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum". The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum".

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after 36 months [insert date].

(End of clause)

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGES |
|---|---|
| J | 1 \| 3 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| P00004 | 17-Feb-2006 | | |

| 6. ISSUED BY CODE W91CRB | 7. ADMINISTERED BY (If other than item 6) CODE S1212A |
|---|---|
| US ARMY RDECOM ACQ CTR - W91CRB<br>UNIQUE MISSIONS DIVISION<br>ATTN: AMSRD-ACC-U<br>4118 SUSQUEHANNA AVENUE<br>ABERDEEN PROVING GROUND MD 21005-3013 | DCMA SOUTH FLORIDA - HOLLYWOOD - S1212A<br>6100 HOLLYWOOD BLVD SUITE 310<br>HOLLYWOOD FL 33024-7981 |

**8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)**
POINT BLANK BODY ARMOR, INC
2102 S.W. 2ND STREET
POMPANO BEACH FL 33069-3116

CODE 62283 FACILITY CODE

| | |
|---|---|
| | 9A. AMENDMENT OF SOLICITATION NO. |
| | 9B. DATED (SEE ITEM 11) |
| X | 10A. MOD. OF CONTRACT/ORDER NO. W91CRB-04-D-0014 |
| X | 10B. DATED (SEE ITEM 13) 07-Jun-2004 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

**12. ACCOUNTING AND APPROPRIATION DATA (If required)**

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER (Specify type of modification and authority)<br>Mutual Agreement |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

**14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)**
Modification Control Number: comer0106874

a. In accordance with Modification P00003 Point Blank's cost for the lot ballistic testing at an independent lab (H.P. White Laboratories) is an additional $0.81 per set.

b. The shoot packs and shipping to the independent lab will be provided at no cost to the government.

c. Reference Summary of Changes.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>SHERRI L COMER / CONTRACTING OFFICER<br>TEL: 410-278-0867 EMAIL: Sherri.Comer@us.army.mil | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br><br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY Sherri L. Comer<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>17-Feb-2006 |

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

G000619

Appendix Item 5

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

SUMMARY OF CHANGES

SECTION A - SOLICITATION/CONTRACT FORM

The total cost of this contract was increased by $565,256.88 from $239,400,000.00 to $239,965,256.88.

SECTION B - SUPPLIES OR SERVICES AND PRICES

CLIN 0001
The pricing detail quantity has decreased by 697,848 from 840,000 to 142,152.
The total cost of this line item has decreased by $198,886,680.00 from $239,400,000.00 to $40,513,320.00.

CLIN 0002 is added as follows:

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---|---|---|---|---|---|
| 0002 | | 697,848 | Each | $285.81 | $199,451,936.88 |

GSA Contract No. #GS-07F-8942D
FFP
INTERCEPTOR Body Armor Extremity Protection:
Deltoid and Axillary Protectors, Desert (effective through May 31,2005)
Universal Camouflage effective June 1, 2005.
See Fact Sheet, Attachment 01 - Purchase Description for Body Armor, Multiple Threat / Interceptor (CO-PD 00-2F dated 21 March 2005) and Attachment 02 - DAPS NSN Listing.

Delivery Order.
FOB: Destination

MAX NET AMT $199,451,936.88

ACRN AA $0.00
CIN: 000000000000000000000000000000

SECTION E - INSPECTION AND ACCEPTANCE

The following Acceptance/Inspection Schedule was added for CLIN 0002:

| INSPECT AT | INSPECT BY | ACCEPT AT | ACCEPT BY |
|---|---|---|---|
| Origin | Government | Origin | Government |

SECTION G - CONTRACT ADMINISTRATION DATA

Accounting and Appropriation

Summary for the Payment Office

CLIN 0002:
Funding on CLIN 0002 is initiated as follows:

ACRN: AA

CIN: 000000000000000000000000000000

Acctng Data: To be cited on individual delivery orders.

Increase: $0.00

Total: $0.00

(End of Summary of Changes)